May it please the court. My name is Harvey Weisbart for the appellant and I've reserved two minutes, if you will, for rebuttal. All right. Thank you, Mr. Weisbart. Thank you. You may proceed. Your Honors, in 1989, the Sentencing Commission drastically revised Section 1B1.3 of the Sentencing Guidelines dealing with a defendant's responsibilities for the acts of another, a conspirator or confederate. And they did so by turning the focus of foreseeability away from the way that that concept had been traditionally handled in the criminal law, guilt law, that aspect of the criminal law. And they did it by limiting a defendant's accountability for the acts of another to the scope of the agreement that that defendant entered into as he understood it. Well, let's get right to the point. Okay. Counsel, obviously Judge Hayden was listening to your argument in that regard and decided that 2B1.4 was the applicable guideline, not 1B1.3. So why, when there is a specific guideline directly on point with commentary that appears to be directly on point, would the district court be viewed as wrong or in error for following that guideline? You've jumped me right to another place in our argument. But I agree with Your Honor that that's where we need to go here. There's three reasons, I believe, that I can offer as to why the district judge was wrong in that respect. First of all, as an overview, the commentary, as with the guidelines themselves, is no longer binding. It's just advisory. So it doesn't have the force of law, as it were. That's true. But the Supreme Court's decision, Stinson, as has been pointed out to us, talks about how important the commentary is, that that's really sort of the definitive insight into how to look at the guidelines, right? Yes, that's true. I can't dance around that anymore. But the guidelines themselves tell us that the purpose of the background to a commentary is not to promulgate binding rules of application, but to provide, quote, reasons underlying the promulgation of the guideline. That's in 1B1.7. And I think if we do that, if we look to the actual wording of this 2B1.4 and what the drafters said, it's clear that what they were dealing with, and the reason they put that little portion of the commentary in there that's troublesome to us, obviously, us being the appellant, is that they were dealing with and wanted to obviate certain proof problems concerning the difficulty of identifying victims and the loss or gain. And they decided that that was the way to handle that by simply, if there was such a difficulty, simply attribute everything that the defendant did for the purpose, attribute to him what a co-conspirator did for the purpose of computing that. But that was not an issue here. But that's a policy judgment, right? It's a policy judgment how to approach it. Your complaint is akin to the complaint that people had for years about the crack powder cocaine disparity, that it's not fair to view those as being so vastly different. But the sentencing commission, with the backing of Congress, had made a decision about that, and it was what it was for years. I mean, they've changed it. Some people are still unhappy with it. But it reflects a judgment that the commission has made. If the district court judge doesn't disagree with the policy, and some district court judges do, you know, Judge Rakoff up in the Southern District, a very wise and good judge and articulate man, has taken issue with it, and so have some others, I'm sure. But the district court here didn't view it as problematic. Why should we insert ourselves and say, no, you've got to take issue with that policy, district court judge? Well, I think that this court, and I'll try to get back to where I was in my three points on the guideline, but I think that this court's got to take a broader view. And what I think they're doing here, if you adopt the government's construction, and by the way, a construction that the government never even thought of until Judge Hayden brought it up sua sponte, at the argument. And there's a number of reasons that point to that. Well, it's pretty clear, I suggest, that they didn't. But it doesn't matter if they were wrong in not thinking of it then. The question is, are they wrong now? And they're certainly entitled to bring it up. I can't say that. But I think it does tell us something. But what this court, I think, should be looking at is whether, in light of that one line in there, that one sentence, and obviously one sentence could kill you as much as two. But in light of that, are we just relegating foreseeability to the trash can in this case, given the importance of foreseeability as a foundation stone of criminal sentencing responsibility? And that's what I believe. This is Judge Greenberg. This is significant in terms of the amount of the loss, the amount gained? Yes, Your Honor, because the loss attributed to Kluger was the loss of The loss, even though, in a sense, it was a sort of a, I don't want to call it a sub-crime, but a sub-deceit going on here. Well, it was Kluger that was deceived. Yeah, that's what I mean. Yes, indeed. I mean, the record is irrefutable, really, as to what we could prove, and some aspects of it are undisputed, at a proper hearing, if we had one. And that is that these fellows, the other two, kept to themselves the fact that they were trading, or that Bauer was trading, in these enormous amounts that resulted in $35, $37 million, when Kluger thought he was dealing with a very small scheme, that he had structured exactly that way to keep it small. When you say he had structured it that way to keep it small, is it really fair to say that a fellow who enlists people to take inside information, a sophisticated actor like your client, who over the course of 17 years feeds insider information to a securities trader, that in circumstances where he doesn't look over Mr. Bauer's shoulders, indeed, he appears to be doing things to make sure there's no way people can connect him to Mr. Bauer, and he's not keeping track of it, so there's no oversight at all? Is it really unforeseeable that Mr. Bauer, who can trade 10,000 shares as easily as one share with the push of a button, would not start taking more money than whatever it was that Mr. Kluger wanted to take for himself? Well, the point is, Your Honor, that that was exactly the issue that should have been addressed, and that we were entitled to have addressed at an evidentiary hearing. And there's strong factors that support Kluger's view of this. Even if she had had a hearing, what was she going to do? She was going to hear Mr. Kluger say what she'd already heard him say, at least through you, that this was a surprise to him. She doesn't believe it. I mean, she indicated she found it incredible that he could not have foreseen that Bauer would be doing some profiteering on his own. Well, but let me, if I may, let me just bring you back to what it was that Kluger was saying and what backed him up. One is that Kluger, actually with Robinson, would agree on a small number of shares to be bought in any particular instance, and they would pass that along to Bauer. Let's make it up, 100 shares of U.S. steel. And that's what he thought they were doing. Now, when the money came back after the sale, Kluger got exactly the amount that reflected a compliance with that agreement on the part of Bauer. He got back one-third less expenses and taxes that Bauer would have reaped on 100 shares of U.S. steel, not knowing that Bauer was buying 100,000 shares. Now, I fail to see why that would make his story that he had this agreement incredible. Rather, it highlights it, and on top of it, as the government belatedly informed Kluger, but in time for the sentencing, the others had agreed, admitted, that they hid all this from Kluger. Why? Because they were afraid, and at least that's what we postulate, and I think it's implicit in their letter, that they were afraid he would stop the scheme, because the Kluger wanted to keep it small. As I understand it, the reason is that he was smart enough to know that more modest dealing might avoid the authorities seeing what was going on. It didn't reflect his thought that, oh, boy, that's terrible to take that much. No, no, I agree. I don't think it reflected any moral compass on his part. We're hard-pressed to defend anything that he did, but the fact is that 1B.1.3, and if we're looking so much at the guidelines, let's look at that. The commission decided that criminal accountability for the acts of another should be limited to what that individual understood to be the scope of the agreement, and this court in Colato said it was a very significant departure. Sure. Let's look at one. I mean, there's two sections to 1B.1.3, and the government has made an argument under A1A that your client is directly responsible, but this isn't really an issue, even if we were to look at 1B.1.3 and not to the specific guideline, 2B.1.4, that we should be looking at subsection A1A of 1B.1.3 because that section pins liability on Mr. Kluger as a principal. He's not just a co-conspirator there. He's directly responsible. As an aider and a better. Is that their argument? I don't even take their argument to be, and I'll let the government speak for themselves. I don't even take them to be saying he's an aider and a better. That he's directly responsible, that he's somebody who, under the language of that guideline, participated directly in the criminal behavior, and the fact that Bauer does something additional or trades additionally doesn't mean that the information that was given by Kluger wasn't directly responsible and he's not directly liable for it. What's the problem with their reasoning on that front? Well, first of all, I don't think that is their reasoning, but they did make a similar argument about aiding and abetting in any event. The reason is that that's part of the same section with the 1B.1.3, the section that we've been discussing about conspirator liability, responsibility for the acts of another. So how can we say that that section, that subsection, is rendered meaningless because of the rest of 1B.1.3? I mean, I think it's an old adage or a tenant of construction that you've got to give meaning to all the parts of the statute. And I think, again, you're just taking foreseeability, which is a huge importance in this context, and tossing it away. And before I forget, if I might, I have a feeling I'm interrupting you, Judge Jordan. No, no, go ahead. But let me just say that one of the other things is that the government places a great stress on is the court's attention to this in Cespedes, where you focused on unless otherwise specified in the introduction in 1B.1.3. But I take that to mean that it must be specified in the other section, whatever that other section is. Specified means specifically referenced. Now, it doesn't mean somehow by implication. And there's nothing in 2B, I'll get my numbers mixed up, 1.4, that says anything about this is deemed to be an exception to the general rule of foreseeability. In my mind, in our mind. If we agreed with you on this, we would tell the district court to recalculate what the proposed or no longer binding guideline range was, and then make her sentence taking that modified range into account. And she might or might not change the sentence after having done that. Is that right? Well, I would love that to happen, but I have to disagree, Your Honor, that she might or might not change the sentence. I think if you change, if you accept what we think we can prove, which of course Judge Hayden has now I think precluded herself from ruling on, but if you accept that, the amount is, we said it was around 500 or 600, 400 and something. The government says, well, that was after taxes. It should be around 900. So if the total loss calculation is somewhere around 2 to 3 million, that would be far, far afield from getting up to the guideline range that governed here, which was up at around 30 million. I don't see how the judge could do it. She would be making a monstrous upward departure. Well, would that sentence that she imposed be in excess of the top of the guidelines under the sentence recalculated as you would, not the sentence, the range recalculated as you would figure it? Oh, yes. If I think I understand you correctly, Judge, the guideline range for a couple million is way. And I understand this and I don't blame you. But the principal thing that really bothers at least an attorney, maybe if she goes out of a one-man office, that this attorney who was like one of the biggest, most prestigious firms in the United States and knew precisely what he was doing was engaging this over years and years and years. That's a shocking state of affairs, at least I thought it was. Well, I think Judge Hayden thought that way too. And she, you know, very rightly castigated him for his conduct. And we all do. I mean, what can be said about the propriety? Particularly we're all attorneys in this room and we, you know, pride the integrity of the profession. There's little to be said to justify it. But that doesn't mean that he gets a sentence up here when he should get one down here. Well, when you say he gets one up there when he should have got one down here, of course that all depends on accepting your argument. Of course it does. And that leads me to ask, since you've raised it here in oral argument again, that Judge Hayden has precluded herself from looking at this case again. I read the sentencing hearing. She seemed to handle this with great thought and care. On what basis do you say, as you do in your brief, that if the case were to go back, she couldn't be fair and impartial? Well, I wish I didn't have to defend what I think is the indefensible. But she basically said, not basically, she said that even if we had a hearing at which Kluger put in all the proffer that Mr. Zagas, you know, put before the court at sentencing, that it wouldn't make any difference in her ultimate determination that he was responsible for Bauer's gain. Right. Having done that, how could she sit and decide a hearing that she's already decided the outcome of? Well, how about because of at least two reasons? One, because if under 2B1.4, as the applicable guideline range being in place, what he thought is irrelevant because the guideline, that particular guideline doesn't ask any question about versatility. Oh, but then there wouldn't be a hearing. Right. Oh, I agree with you. I mean, this is a case. And if there were to be a hearing, why also would it not be appropriate for her to say, in effect, I've heard your proffer. Even if he got on the stand and said the things you say he would say, even if Bauer and Robinson got on the stand and said the things you say they would say, based on things that have already come before me, it occurs to me that, and the character of the crime, this is foreseeable. I could accept your proffer as being 100% accurate. And even with that, 100% accurate, they get on the stand, they say the things you say they're going to say. I don't believe that this was unforeseeable conduct because just like you go into a bank robbery and somebody says, I had no idea they were going to shoot the teller. Well, did you go into the bank? Did he have a gun? And you couldn't foresee that the gun might be used. You hand inside information to a trader and tell him, hey, we're going to steal money from the public. Oh, I'm shocked that you took more shares. I don't believe it. What's wrong with a sensible judge saying I can accept your proffer and still say that I would find that incredible? That strikes you as over-the-top biased and unable to fairly handle the case? Absolutely. Absolutely. I don't see how the judge could come to a conclusion about whether Kluger limited himself under 1B1.3. Now, of course, as we said, if 2B governs, we're out of luck. But under 1B1.3, in determining the scope of his agreement, what else does it mean? It's the same for a drug dealer. They've permitted drug dealers, drug people involved, to say, well, I didn't know it was going to be 12 tons of marijuana. I thought we were just going to get an ounce or something like that. They permitted that. And there's no exception here for lawyers or other professionals. So, no, the answer is, clearly, and I have great respect for Judge Hayden. I know her well. And I think she just locked herself in or out, if you will. So I think here there was, as I said. I don't understand that for this reason. It seems to me that you could say to a judge, no, you're wrong, because we think that if he really understood what was going on, he would not have taken, and I don't like to use the term, but in terms of what you say, happened, crumbs, and just gone along with that. He would have been saying something. But even if that's true and the judge made a mistake, it's not the kind of a mistake that's like a personal kind of a thing where you recuse a judge. I mean, judges make mistakes all the time, you know, in finding facts and so forth. But you don't recuse them because of that, unless there's some personal animosity or questioning of the judge's ability to accept a direction from the appellate court. I mean, why wouldn't she accept a direction if we reversed? Well, in theory, we have to assume that she would try to do it, but I think the case is, Judge Greenberg, also to the effect that it's not just for personal bias where a judge commits themselves to a statement of facts or to a finding, rather, not a statement, a finding of fact that that judge cannot go back and revisit that if the case goes back to the judge. You know, years ago, I had a case. I'll never forget it. A judge granted a summary judgment in a non-jury case, and we remanded the case. And I can understand what you're saying. We thought there was a dispute of facts. I remember writing an opinion, remanding it, and saying the judge was wrong. There was a dispute of facts. Now go try the case. I have to admit that when I signed whatever I signed, remanding the case, I had a feeling it might come out the same way as it did on the summary judgment after the judge heard the evidence. And actually, of course, it did. But it didn't occur to us that we should recuse the judge from hearing the case and making a determination by assessing all the evidence and weighing it rather than seeing if there was a dispute of facts. I mean, that happens all the time. Well, I don't know if it happens all the time, but I see that my time is out. That takes care of that.  Thank you, Mr. Weisgarten. If I have any other remarks, I'll save them for rebuttal. All right. Thanks very much. Ms. Sedlowski. May it please the Court. Caroline Sedlowski on behalf of the United States. Starting with the reassignment, I think it's clear from the record here that we're, you know, the defendant has said we're not talking about an extrajudicial motive or bias that the judge had. It has to do with her analysis of the record. And the judge's determinations were made based on her fulsome analysis of the record in front of her. And she decided that the record and extensive portions of Mr. Kluger's admissions during his plea colloquy, the recordings of him on tape, the proffers made by his co-conspirators all went to show that even if he had testified, she understood the facts to be a certain way. Of course, that's only an issue if you lose, right? And you're not planning to lose, I assume. I think it's mid. All right. So let's get to why you think you should win. You've heard Mr. Weisbart talk about how the government didn't even raise 2B1.4, so maybe it's really not all that clear that it should apply. Is there a reason why the government didn't make that argument? Was Judge Hayden wrong to say that's the applicable guideline? I think the government was focused on – I think it seemed apparent to the government at sentencing that the reasonable foreseeability of this harm was so obvious that they chose to go sort of with one argument. And I think stepping back on appeal, of course, the judge's decision is defensible for any reason obvious in the record, so we want to make sure for the court of appeals. I guess I'm asking as a legal matter, though, what's the right applicable guideline? Is 2B1.4 the correct applicable guideline, or did she get that wrong? No, 2B1.4 is the correct applicable guideline. You do not need to go to 1B1.3 at all, because it lays out clearly what the amount of gain was in this situation. Now, what of the argument we've heard from the defense that that throws foreseeability on the ash heap and that can't really be fair or right? Well, even 1B1.3 says foreseeability is not relevant to A1A liability. So foreseeability is not the lodestar of deciding liability for acts of a defendant. In this case, I think the guidelines just make clear in a complicated area how to handle what could be an unmanageable or unmeasurable amount, and they cut off liability, for instance, for downstream tipping. But I think it's helpful to the courts to have something clear like this set out, and you could say, well, the guidelines are explaining what reasonable foreseeability is in this case in some sense. They're saying if you participate in the act, you are responsible for the gain from the information you provided to people. And that is, in a sense, a concept of reasonable foreseeability liability and constrains the defendant's liability in a sense. You've mentioned subsection A1A. You want to give us your argument on that? I know it's in your papers. I understood that to be in the nature of an assertion of direct liability as opposed to being merely an aid or in a better, but maybe I misunderstood you. You're correct, Your Honor. He's directly responsible, and so he's responsible as a principal. I mean, if the court doesn't find him as a principal, they could also find he was an aid or in a better. A1A is written quite broadly, but he directly participated by providing the inside information for each trade. And so he is responsible as a principal or as an aid or in a better. I mean, it has many bases for direct responsibility. And what's the foundation for your argument that foreseeability doesn't enter into that subsection? That's the plain language of the guideline 1B1.3 commentary that A1A is not subject to the test for reasonable foreseeability. And that's echoed in this court's decision in Perez 280 at 3rd at 353. And so the role of reasonable foreseeability under 1B1.3 is to talk about acts in which you didn't directly participate. When you're talking about a much broader conspiracy, and traditionally under criminal law, even if you were a small part of that conspiracy, you might be held responsible for the liability of all your co-conspirators. And the commission was concerned with very attenuated responsibility. And here, what's obvious is that this is not a very attenuated, this is not a circumstance of very attenuated actions on the part of his co-conspirators. They're trading on the information he gave them. And so he's completely unlike someone in a drug conspiracy who agrees to participate in one trade, and even if they know about the other trades, has nothing to do with those other trades. He was responsible for all the trades. I'm curious about the disparity argument that's been put before us. I really didn't get into that with Mr. Weisbar, but it features pretty prominently in the briefing. And Judge Hayden did make a point of mentioning her appreciation for the sort of chart or listing of various insider trading, high-profile cases that have occurred at or around the time that she was dealing with this. And very, very largely, the defendants were receiving below-guideline sentences. And in fact, Mr. Bauer, who got a whole lot more out of this than Mr. Kluger, ends up with a shorter sentence than Mr. Kluger. Why shouldn't we be concerned about disparity in a circumstance like that? Well, I think the factors that the Commission and the courts that have been critical of the guidelines observed were not present in the cases where they varied downward from the guidelines. We're all present here. And indeed, the difference between Mr. Bauer and Mr. Kluger is one of those factors. Mr. Kluger was responsible and received an enhancement for an abusive position of trust. He occupied a unique position as an attorney, and he did it for an extraordinary amount of time and over the course of an extraordinary amount of trades. So for his entire legal career, from the time he was a summer associate until seven years later through four firms, putting down the scheme when he didn't have access, picking it up again. Notwithstanding that there were two federal investigations into Bauer's trading that he knew about, and over the course of 30 trades, taking a lot of pains to hide from law enforcement sets him apart from the other defendants. And again, you know, Mr. Kluger would like this to turn on the amount of money he made, but there's so many other components to his scheme. And what the judges were critical of in the Second Circuit in particular, or in the Southern District, was that this amount of money would really control the sentencing guideline scheme when all these other factors, sort of how deep into it were you? And what's your role? I mean, it's driving it here too, right? I mean, would your position be any different if Mr. Bauer had traded ten times the amount he did? You'd be coming in here, wouldn't you, with the loss calculation driven by the tables, and be saying, no, his guideline range is now dictated by that much higher gain. Would I be wrong? Maybe I would be wrong where it's counterfactual, but I don't see any hesitance on the part of the government to say $30 million smacked Kluger with the whole shebang, and I don't think you'd be arguing differently if it was $90 million, would you? Well, it's hard to say. I mean, I agree with the courts that at some level the number does become meaningless. We're not at that level here. I mean, the question is if he had traded last. Why not? That's the question. Why not? He walks away with something less than 500 grand, and yet the guideline calculation is driven by a number north of 30 million. Why isn't that a big enough difference in numbers to cause some concern and to say this whole thing is being driven by a chart that some people in an office in Washington, D.C., with the green eyeshades on, came up with, and not with what's going on in this case? Because that's the, you know, I'm not doing justice to the defense argument, but that seems to be the tenor of it, and that certainly has given concern to other thoughtful judges around the country. Why should we not be worried about that? Well, that may be what dictates the guidelines range going into step three of the sentencing, and the judge was very aware of those arguments and said I am not making a determination at the end of the day. This may be where the guidelines range puts him. I am aware that many judges have said this isn't great, and I understand where they're coming from, but here I am making my third step determination based on all these other components of his actions, all these other characteristics of his acts. So I do disagree with the defendant when he says if this goes back, the judge couldn't do anything else but sentence him to a lower sentence. I actually think the judge was very clear in saying, Los Schmoss, you were an attorney who did this for 17 years, 30 times over. You didn't care what the loss was. You just cared that you were going to distance yourself as much as possible from this and continue your scheme as long as possible, and you were extremely bold in doing it through the course of two federal investigations, and when it was over, you obstructed justice and told your co-conspirator to destroy evidence in this case, and all these factors went into the judge's final determination, and so while the judge has the ability to consider the disparity and did consider the disparity, it ultimately had the discretion to decide this wasn't determinative of its sentence, and that's why it came out where it did. Okay. Thank you. Judge Greenberg, do you have any questions? No, I understand the case. Thank you. Okay. Thank you very much. Just briefly, well within my reserve, I won't abuse that. Just a couple of things. First of all, what Ms. Sadlowski just said about what Judge Hayden found in her thinking on this, I think just proves the point why Judge Hayden is so locked in that if there were a remand, it shouldn't go to her. I mean, essentially what counsel was saying is that this is what the judge is going to do anyway, and she made that clear. I think so. Well, it sounded like she was saying not what Judge Hayden would do, but that you're not correct about the driver here being solely gain. That too. Now, let me just advert for a moment to just two other things. One is, of course, you know we have a much more discretionary argument dealing with the 3553A application, but I think it doesn't go without noting that in that discussion, the judge never even mentioned how much money Kluger actually got out of this. I mean, okay, the guidelines up here because of the chart made by those little green men, or the men and women with the green eyeshades, rather. But on the other hand, doesn't the amount that he got, that he profited in comparison to somebody like Bauer, have any meaning, any significance, even under a discretionary determination? She certainly knew it, but she didn't mention it. And she did talk about it. I mean, in the course of the sentencing, it certainly came up, right? Well, it came up earlier in terms of the getting to the guideline range, but when she got to the point where she was really discussing, well, let's see what sentence I'm going to give now that I've got this range, she never mentioned it again, along with other factors. And I do understand that we're now moving into a much more discretionary area, but I think it kind of reflects back. And also, I don't want to sit down without pointing the court again to the forfeiture and the SEC disgorgement, both of which were down in the $400,000, $500,000 range. The government had every right, if they believed in this argument, to have said that Kluger should forfeit $30 million. Maybe he'll hit the lottery next week. It's not the first time that they've tried to impose forfeiture amounts on an individual who, at the moment, doesn't seem to have the assets. This wouldn't be unique at all. But they stuck with that lesser amount. And I think they did it because they were focused on foreseeability when they came in there. As I've already agreed, they could have been wrong then. Maybe they're right now. I hope not. But that was where they were looking. They even had Robinson available to be a witness in a hearing that they thought was going to happen. Okay, thank you very much. Thank you very much, Your Honors. Thank you, Judge Greenberg. Appreciate the arguments. We'll take the case under advisement.